UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL R. MOSCA, | HONORABLE JOSEPH E. IRENAS |
| Plaintiff, | CIVIL ACTION NO. 03-0168 (JEI) |
| v. | |
| AVIS COLE, BILLIE MOORE, LORENZO LANGFORD, BENJAMIN R. FITZGERALD, THE CITY OF ATLANTIC CITY, and JOHN DOES (1-10) jointly, severally and in the alternative, | **OPINION** |
| Defendants. | |

**Appearances:**
JACOBS & BARBONE, P.A.
By: Louis M. Barbone, Esq.
Arthur J. Murray, Esq.
1125 Pacific Avenue
Atlantic City, New Jersey 08401
        Counsel for Plaintiff

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
By: Charles A. Ercole, Esq.
Julie M. Holland, Esq.
457 Haddonfield Road, Suite 510
Cherry Hill, New Jersey 08002
        Counsel for Defendants

**IRENAS**, Senior District Judge:

Plaintiff Michael Mosca ("Mosca") filed a somewhat prolix twenty-one count complaint[1] alleging various common law claims, as well as violations of state and federal statutes and constitutional provisions, arising out of the termination of his

---

[1] Plaintiff originally filed suit on January 14, 2003, in the Superior Court of New Jersey, Atlantic County, and the case was removed to this Court pursuant to 28 U.S.C. § 1441. Thereafter an amended complaint was filed. References to the "complaint" in this opinion are to that amended complaint.

employment as a part-time Assistant City Solicitor for the City of Atlantic City.  The Defendants are The City of Atlantic City; its mayor, Lorenzo Langford ("Langford"); its Business Administrator, Benjamin Fitzgerald ("Fitzgerald"); and two one-time friends of Plaintiff, Avis Cole ("Cole") and Billie Moore ("Moore").  At the time Mosca was hired (May 13, 2002) and fired (June 10, 2002), Cole and Moore were employed by the City as attorneys.

The first six counts of the complaint are New Jersey common law claims against only Cole and Moore. Counts seven and eight are common law claims against the City, Langford and Fitzgerald. Counts nine through eighteen are various federal statutory claims against the City, Langford and Fitzgerald, although counts nine and ten also include New Jersey state constitutional claims. Count nineteen sets forth a state constitutional claim against the City, Langford and Fitzgerald, while count twenty sets forth a New Jersey Law Against Discrimination claim against the same three Defendants. The last count seeks injunctive relief.

This Court's jurisdiction is based on 28 U.S.C. § 1331 (federal question) as the complaint alleges a variety of federal statutory and constitutional claims. Defendants seek summary judgment under Fed. R. Civ. P. 56 on counts three through twenty-one of the complaint.  For the reasons set forth below, the Court will grant summary judgment for Defendants on all of Mosca's

federal claims.  This Court declines to exercise supplemental jurisdiction over Mosca's remaining state law claims, and remands those counts to the Superior Court of New Jersey, Atlantic County, pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).

## I.

Mosca, a white man, was hired by the City of Atlantic City ("City") in July, 1992, as an attorney in the Municipal Prosecutor's Office.  Municipal Prosecutors in the City serve as "unclassified" employees, that is, they do not have tenure and do not receive civil service protections.  At the time the events of this lawsuit arose, Mosca had been appointed to a one year term of employment to expire on February 7, 2002.[2]

In November, 2001, Langford, an African-American man, was elected mayor of Atlantic City.  On December 18, 2001, all four attorneys in the Municipal Prosecutor's Office, including Mosca and his supervisor, received notice from a Langford aide that their employment would be terminated effective December 31, 2001.  Shortly before the new year, however, Mosca learned that he would be retained until the expiration of his one year term on February 7, 2002, and his appointment would not be renewed.

---

[2]Mosca has also maintained a private practice since 1990, and has served since 1997 as a Municipal Prosecutor in Ventnor, New Jersey.

3

Mosca did not support Langford's mayoral campaign, but remained interested in working for the City after the change in administrations.  Mosca spoke with several people connected with the Langford campaign to express his interest in staying with the Municipal Prosecutor's Office.  Two of the people he asked to assist him in obtaining employment in the Langford administration were Defendants Cole and Moore, both African-American women. Mosca and Cole were friends, and had met when Cole worked for the Municipal Public Defender's Office.  Moore worked with Mosca in the Municipal Prosecutor's Office for several years in the late 1990s.

On or about December 18, 2001, Mosca telephoned Cole at her home, during a Christmas party she was holding, seeking her assistance in retaining a position with the City.  The exact subject matter of the conversation is disputed, although Cole alleges that Mosca called Langford a "bow-tie wearing, bean-pie eating Muslim." (Dep. of Avis Cole, at 60).  While Cole contends that she discussed the comment with only with Moore and the wife of a City Councilman, it found its way into the City "rumor mill," and eventually reached Langford and City Solicitor Stephen Smoger ("Smoger").[3]

---

[3] The rumor mill also included an allegation that he had actually attended Cole's party and had also used the word "nigger." Cole does not make this assertion, and Defendants do not seem to argue that Mosca in fact used that word. While the record is wildly divergent on who said what to whom over the six month period that events unfolded, there seems to be no dispute that there was "buzz" in the City over Mosca's alleged comments.

Notwithstanding the rumors, on May 13, 2002, Mosca interviewed with Smoger, a white man, for the position of part-time Assistant City Soliciter, acting as a liaison between the Solicitor's Office and the City Police Department.  Deputy Mayor Ernest Coursey ("Coursey") was also present for the interview. The parties dispute whether Mosca's alleged comment was discussed at the interview.  According to Mosca, he was questioned about the prosecution of Reverend Al Sharpton ("Sharpton") and his connections to the previous mayor and his administration. Defendants contend that Coursey asked Mosca about the comment, and Mosca denied making the comment.  Mosca alleges that Coursey left the interview to meet with Langford, and returned to tell Mosca that he would be hired.

Mosca began work in the City Solicitor's Office on May 15, 2002.  Shortly thereafter, Langford met with Cole and Moore to discuss Mosca's alleged comment.  Langford testified that he believed he discussed the alleged comment with his chief of staff and Fitzgerald.  Langford also stated that he asked Fitzgerald to look into the matter.  Fitzgerald testified that he did not conduct an investigation, but only took information from Moore and consulted Langford's staff.  Smoger fired Mosca at Langford's direction on June 10, 2002.  Jackie Abdur Razzaq ("Razzaq"), an African-American woman, was later hired as a full-time attorney in the City Solicitor's Office.

## II.

Under Fed. R. Civ. P. 56(c) a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The role of the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

### A.

Mosca sues the City, Langford and Fitzgerald in counts twelve, thirteen and fourteen alleging that he was terminated

6

because he is white in violation of 42 U.S.C. § 1981.  In *McDonald v. Santa Fe Trail*, 427 U.S. 273, 286-96 (1976), the Supreme Court held that the federal civil rights statutes afford white plaintiffs a federal remedy for race discrimination in employment.

A plaintiff alleging workplace discrimination will often not have direct evidence of his employer's discriminatory intent or animus.  To effectuate the statute's remedial purpose, the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), held that in a failure to hire case a plaintiff may establish a prima facie case of racial discrimination by showing:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802.[4]  The Supreme Court noted, however, that "[t]he facts necessarily will vary in [employment discrimination] cases, and the specification above of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect due to differing factual situations."[5]  *Id.* at 802 n.13.

---

[4]Although *McDonnell Douglas* was decided under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Supreme Court in *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989), held that the same burden shifting rules should be applied in § 1981 cases.

[5]Employment discrimination cases arise in a variety of different contexts, *i.e.* failure to hire, failure to promote, termination, adverse change in working conditions, and workplace harassment. The Third Circuit has repeatedly emphasized that the requirements of the prima facie case are

When a plaintiff alleges that he was discharged due to unlawful discrimination, courts have typically adapted the *McDonnell Douglas* framework to require the plaintiff to show that: (1) he is a member of a protected class; (2) that he was qualified for the position; (3) he was discharged; and (4) other employees not in the protected class were treated more favorably. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993).

If a plaintiff satisfies his initial burden under *McDonnell Douglas*, it creates a presumption of discriminatory motive. The burden then shifts to the employer to produce "some legitimate, nondiscriminatory reason" for the action taken. *McDonnell Douglas*, 411 U.S. at 802; *see also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer is not required to persuade the court that the legitimate, nondiscriminatory reason actually motivated its decision, as "[i]t is sufficient if the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

---

flexible. *See, e.g., Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999)(rejecting the interpretation that the fourth *McDonnell Douglas* prong required a plaintiff to prove that he was replaced by someone outside of his protected class). The ultimate effect of the burden shifting structure is to relieve a plaintiff of the need to offer direct proof of one element of the cause of action, the employer's discriminatory intent, in satisfying his initial burden of going forward. However, when all proofs are in the plaintiff still has the burden of proving intent by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-508 (1993).

Should the employer meet its burden, the plaintiff must be given the opportunity to show that the employer's proffered reason was pretextual.  *McDonnell Douglas*, 411 U.S. at 804.  A plaintiff can survive summary judgment by pointing to "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.

Although the burden of production switches from plaintiff to defendant and back through the operation of the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253.

**B.**

Obviously, the cause of action for white plaintiffs recognized in *McDonald v. Santa Fe Trail, supra,* could not benefit from the *McDonnell Douglas* burden shifting analysis if the plaintiff were forced to establish that he or she were a member of a minority group. While many cases counsel that the burden shifting test should be articulated in a flexible manner,

9

most of those cases arise where the need for flexibility results solely from the particular nature of the alleged discrimination (failure to hire, termination, failure to promote, retaliation, workplace harassment, etc.).

Common experience tells us that minority groups in the United States (or for that matter any country or community) are frequently subjected to pervasive discrimination in the workplace. "Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). Thus the traditional *McDonnell Douglas* first prong, that the plaintiff be a member of a minority group, embodies a significant part of the reason for easing a minority plaintiff's burden in proving a prima facie case. Altering the *McDonnell Douglas* test to eliminate the requirement that plaintiff be a member of a protected class is more than a technical change mandated by the nature of the discrimination alleged.  Rather, to some degree it cuts to the heart of the reason for the test in the first place.

Thus, courts have struggled to replace the minority membership prong with a test which remains faithful to the concept of *McDonnell Douglas,* but yet recognizes the significance of the change.  Several Courts of Appeal have held that to make a prima facie case a white plaintiff must show "background circumstances" which indicate that the defendant is "that unusual

10

employer who discriminates against the majority." *Parker v. Baltimore & O.R. Co.*, 652 F.2d. 1012, 1017 (D.C. Cir. 1981).

The D.C. Circuit later expanded on this test when it explained that "background circumstances" included evidence that a particular employer had a reason or inclination to invidiously discriminate against whites and that there is something about the facts of the case that raises the inference of discrimination. *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993).  In some sense courts adopting the background circumstances test have substituted events related to plaintiff's particular claim for hundreds of years of American history.

Prior to its decision in *Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999), the Third Circuit had never addressed the nature of the prima facie case required of a plaintiff alleging "reverse discrimination."  *See Poli v. Southeastern Pa. Transp. Auth.*, No. 97-6766, 1998 WL 405052, at *5 n.5 (E.D.Pa. July 7, 1998).  In *Iadimarco* the Court rejected the "background circumstances" test as articulated in *Parker/Harding,* and concluded that "a plaintiff who brings a 'reverse discrimination' suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less favorably than others because of [his] race, color, religion, sex

11

or national origin.'" *Id.* at 163 (quoting *Furnco Const. Corp. v.
Waters*, 438 U.S. 567, 577 (1978)); *see also Corbett v. Sealy,
Inc.*, No. 03-4190, 2005 WL 612922 (3d Cir. Mar. 17, 2005);
*Medcalf v. Trustees of Univ. Of Pa.*, 71 Fed. Appx. 924 (3d Cir.
2003); *Geddis v. Univ. of Del.*, 40 Fed. Appx. 650 (3d Cir.
2002).[6] This test does not necessarily require direct evidence,
but rather evidence sufficient to support an inference of
discrimination. *Pivirotto*, 191 F.3d at 352.

Both the "sufficient evidence" and "background
circumstances" tests share a common core in that they recognize
that the traditional *McDonnell Douglas* prima facie case was
developed out of an assumption that "common sense and social
context" suggest that when, for example, a qualified African-
American employee is fired and replaced by a white employee,
discrimination is more likely than not to be the cause once other
explanations are eliminated.  *Iadimarco*, 190 F.3d at 157.  As
Judge McKee observed, "[i]nvidious discrimination against white
men is relatively uncommon in our society, and so there is
nothing inherently suspicious in an employer's decision to
promote a qualified minority or female applicant instead of a

---

[6]Although in adopting the "sufficient evidence" test, the Third Circuit
parted company with the District of Columbia, Sixth, Seventh, Eighth and Tenth
Circuits which had adopted the background circumstances test, *Iadimarco*, 190
F.3d at 158-62, Judge McKee, the author of the panel's opinion, explained in
footnote 10 of his opinion that he really did not believe the *Parker/Harding*
test was inconsistent with *McDonnell Douglas.* However, he did believe that the
Third Circuit test "allows for less confusion and more consistency. . . ."

qualified white male applicant." *Id.* at 163 n.10.  This is not
to say that reverse discrimination does not or cannot occur.  The
relevant point is that it has not occurred so frequently as to
justify the assumption that, in the absence of another
explanation for an adverse action against a white employee, we
can assume that a discriminatory motive prompted such action.

### C.

When a white employee asserts that his employment was
terminated based on a discriminatory animus, the *McDonnell
Douglas* test for establishing a prima facie cases has three
requirements: (i) plaintiff was qualified for the job which he
held; (ii) despite these qualifications he was terminated by his
employer; and (iii) plaintiff has presented sufficient evidence
to allow a reasonable fact finder to allow a reasonable fact
finder to conclude, given the totality of the circumstance, that
the employer treated plaintiff less favorable the other because
of his race.[7]

There is no dispute that Plaintiff meets the first two
prongs of the *McDonnell Douglas* test as just articulated.  The

---

[7]The court does not find that a prima facie case requires that plaintiff
be replaced by a non-white person. *See Pivirotto* at 191 F.3d 357 (rejecting
requirement that plaintiff must prove his replacement by someone outside of
his protected class). Plaintiff argues that he was replaced by an African-
American woman, a contention that is hotly contested.  Defendants argue she
was hired for a different job. In any case, this issue will be discussed in
connection with the analysis of the "sufficient evidence" prong.

focus of the dispute in this case is whether Mosca satisfies the sufficient evidence prong.  Plaintiff makes four arguments to support his view that he has made a prima facie case: (i) he was replace by Razzaq, an African-American woman, who was less qualified; (ii) the person who made the decision to fire him, Langford, was African-American; (iii) Langford failed to order an investigation of the alleged racist remarks as required by the City's anti-discrimination policies and (iv) Plaintiff was terminated in retaliation for the prosecution of Sharpton in 2000.  We will consider each argument in turn.

Although disputed by Defendants, for purposes of this motion the Court will assume that Razzaq was hired to replace Mosca.  In a City with a highly diverse population no inference of discrimination can be drawn from the hiring of an African American.[8]  If making such a hiring was by itself a suspicious circumstance, employers attempting to comply with the law would find such efforts used as the basis of a reverse discrimination suit against them.  The argument that Plaintiff was more qualified that Razzaq finds no support in the record.

---

[8]In Atlantic City African-Americans make up nearly half the population and whites slightly more than one quarter. *See* United States Census Bureau, *Fact Sheet: Atlantic City, New Jersey* (2000), *available at* http://factfinder.census.gov/home/saff/main.html?_lang=en (search "Atlantic City, New Jersey")(finding that Blacks/African-Americans comprise 44.2% of the population of Atlantic City, while whites comprise 26.7%).

That Mosca was fired by an African-American (Langford)[9] and replaced by an African-American does not give rise to an inference of discrimination.  The Third Circuit in *Iadimarco* held that "[a]lthough the race and/or gender of the individual(s) responsible for a hiring decision is certainly relevant, it is insufficient to establish a prima facie case of discrimination without more."  190 F.3d at 156.

Plaintiff argues that he was denied an investigation to which he was entitled under the City's anti-harassment policies. The relevant inquiry is whether Mosca was treated differently from other similarly situated employees based on his race. *Turgeon v. Marriott Hotel Svcs.*, No. 99-4401, 2000 WL 1887532, at *8 (E.D.Pa. Dec. 27, 2000); *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 489-90 (E.D.Pa. 1999).  "To be deemed similarly situated the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Bullock*, 71 F. Supp. 2d at 489 (citations omitted).

Mosca's points to two employees who he maintains were afforded a full investigation after sexual harassment charges

---

[9]There appears to be no real evidence that Fitzgerald had anything to do with Plaintiff's termination. Interestingly, Smoger and Coursey, both of whom are white, seem closer to the events leading to Mosca's firing, but were not named as Defendants. All four individual Defendants are African-American.

were made against them: Joseph Gindhart, a white man who served as City Solicitor during the first months after Langford took office; and Ronald Bloom, who is also white, the chief prosecutor under Langford's predecessor. Mosca has provided no evidence to suggest that he was treated differently than similarly situated employees based on his race, since the only two City employees that he identifies as receiving investigations are also white.[10]

Mosca also contends that he was fired by the City, in retaliation for his prosecution of Sharpton in 2000. He maintains that he acted against "the strong and bitter opposition" of Langford, Coursey and Councilman William Marsh III ("Marsh") in pursuing the charges, (Pl. Br. at 20), and that Langford was not in a position to retaliate against Mosca until he took office on January 1, 2002.

Plaintiff presents no evidence in support of his allegation that Cole, Moore or Marsh "educated" Langford on Mosca's role in the prosecution, nor is there any evidence that the Sharpton prosecution was ever discussed with Langford in the context of Mosca's employment. According to Mosca, he discussed the Sharpton prosecution with Coursey and Smoger during his interview, but there is no evidence that Langford was made aware of this discussion at the time or later when he was considering

---

[10]There may also be a question of whether a remark made outside of the workplace would be subject to the City's anti-harassment policies.

firing Mosca.

Nor is there anything in the record to suggest that the dispute over Sharpton's prosecution was based on his race, Mosca's race, or the race of anyone else involved in the dispute over his prosecution.  Coursey, who is white, also opposed the prosecution.  There is simply no evidence that the prosecution of Sharpton played any role, much less a substantial or motivating one, in the decision to fire Mosca.

The circumstances surrounding Sharpton's appearance in Atlantic City are unclear from the record, but if he was there to lead a protest, and the charges against him related to the conduct of that protest, one can imagine a variety of considerations which might go into deciding whether or not to prosecute.  Even were the Court to assume that Langford's decision to fire Mosca somehow took into account his role in the Sharpton prosecution,[11] there is no indication that Mosca's race had anything to do with Langford's unhappiness with that prosecution.

There is at this stage in the litigation a sufficient factual basis for a finder of fact to conclude that Langford's belief that Mosca had made the offending comment to Cole contributed to his decision to terminate him as a City employee.

---

[11]Plaintiff alleges that Cole told him that the Sharpton prosecution played a role in Langford's decision to terminate him. This double hearsay is not sufficient to raise a genuine issue of fact.

17

Whether or not this belief was justified, it is not evidence of animus based on race.  Nothing in this record suggests that Langford was offended by reason of Mosca's race rather than the alleged content of the remark. No one has suggested that the slur would have been considered any less offensive by Langford if the purported utterer was African-American.

The contrast with *Iadimarco* is stark.  The evidence of discrimination presented in that case which gave rise to an inference of reverse discrimination not only met the Third Circuit's "sufficient evidence" standard, but would have also met a standard far more burdensome to the plaintiff. *See id.* at 164-165.[12]

## IV.

In counts nine through eleven and fifteen through eighteen Plaintiff converts his wrongful termination claims against the City, Langford and Fitzgerald into constitutional claims against the same parties under 42 U.S.C. § § 1983 and 1985.  He alleges that his firing violated the Fourteenth Amendment by denying him procedural due process and equal protection of the laws, and the Fourteenth Amendment and First Amendment by violating his free

---

[12] If Plaintiff had met his *McDonnell Douglas* burden to establish a prima facie case, the court would not have granted summary judgment.  Under *Fuentes* a reasonable finder of fact might disbelieve Defendants' articulated legitimate reasons for termination.

18

speech rights.

## A.

Mosca claims that he was deprived of his procedural due process rights by the manner in which he was terminated. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972); *see also Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985).

While Mosca does not argue that he had some kind of tenure in his position which might give him a constitutionally protectible interest,[13] he argues that Langford, Fitzgerald and the City damaged his reputation by publicizing the comments he allegedly made to Cole, without offering him an opportunity to clear his name. In *Wisconsin v. Constantineau,* 400 U.S. 433

---

[13]The Court must look to state law to determine whether Mosca has a property interest in continued employment or any other benefit. *Roth*, 408 U.S. at 577. He concedes in deposition that he was an at-will employee who could be terminated without cause at any time. His somewhat vague assertion that he had an oral employment contract with the City is not tenable, as he has cited no New Jersey statutory or case authority, nor is the Court aware of any, for the proposition that a municipality may convert an at-will employee to an employee with greater rights based on an oral agreement with the employee. The Court also notes that such oral promises are inconsistent with Mosca's written employment contract.

19

(1971), the Supreme Court held that an individual has a protectible liberty interest in his reputation.

The Supreme Court has recognized that when a public employer publishes or otherwise disseminates false and stigmatizing information in connection with an employee's termination, that employee has a due process right to a name-clearing hearing. *Roth*, 404 U.S. 564. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Constantineau,* 400 U.S. at 437.

"For government action to infringe the 'reputation, honor, or integrity' of an individual, that government action first must involve a publication that is substantially and materially false." *Ersek v. Township of Springfield*, 102 F.3d 79, 83 (3d Cir. 1996). The employer must publish or disseminate the stigmatizing information to the public. *Anderson v. City of Philadelphia*, 845 F.2d 1216, 1222 (3d Cir. 1988); *Chabal v. Reagan*, 841 F.2d 1216, 1223 (3d Cir. 1988); *Poteat v. Harrisburg School District*, 33 F. Supp. 2d 384, 391-92 (M.D.Pa. 1999). The disputed or false statements must harm the plaintiff's reputation. *Ersek*, 102 F.3d at 84.

While public knowledge of Mosca's alleged comment may have been "so diverse and so extensive that it was routine," (Pl. Br. at 17), Mosca fails to demonstrate that Fitzgerald and Langford

20

were responsible for the spread of the stigmatizing rumors.  It
is not enough that Mosca's reputation may have been harmed by
office gossip or the rumor mill.  A plaintiff must establish that
the particular defendant was responsible for publicly revealing
the defamatory information.  *See McMath v. City of Gary*, 976 F.2d
1026 (7th Cir. 1992).  There is no evidence that the City,
Langford or Fitzgerald published or disseminated Mosca's alleged
comment to the public.


**B.**

In counts fifteen through seventeen Mosca argues that the
City, Langford and Fitzgerald retaliated against him for
prosecuting Sharpton, and that such retaliation violated his
First Amendment rights.

A public employee alleging that his employer retaliated
against him for exercising his right to free speech must
establish three elements to survive a motion for summary
judgment. *Swineford v. Snyder County Pennsylvania*, 15 F.3d 1258,
1270 (3d Cir. 1994); *see also Fogarty v. Boles*, 121 F.3d 886, 888
(3d Cir. 1997); *Green v. Philadelphia Housing Auth.*, 105 F.3d
882, 885 (3d Cir. 1997).  First, he must establish that his
speech was protected.  *Swineford*, 15 F.3d at 1270.  Second, he
must demonstrate that he suffered some adverse employment action
by his employer.  *Id*.  Next, he must prove that his protected

21

speech was a substantial or motivating factor for the adverse employment action.  *Id.*  If the plaintiff meets this burden, the defendant can still defeat the claim by establishing that he would have taken the same action absent the plaintiff's protected speech.  *Id.*

The City, Langford and Fitzgerald do not contest that Mosca's actions in prosecuting Sharpton are protected.  However, they maintain that there is no evidence that Mosca was fired because of the Sharpton prosecution or that it played a role in his termination.  A plaintiff must "establish[] that the exercise of his First Amendment rights played some substantial role in the relevant decision."  *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000). For the reasons set forth in Part III.C. hereof, there is simply insufficient evidence that Langford's unhappiness with Sharpton's prosecution played any role the decision to terminate his employment.

## C.

Mosca suggests that his Due Process rights were violated when he did not receive a City investigation into his alleged remarks.  He bases this argument on the allegation, thinly supported, that it was the practice of the City to investigate claims of harassment against even those employees who do not have constitutionally-recognized property interests in continued

public employment.

Even accepting the truth of Plaintiff's factual assertion, "[t]he fact that state law may grant procedural protections to an at-will employee does not transform his or her interest in continued employment into a property interest protected by the Due Process Clause." *Thomas v. Town of Hammonton*, 351 F.3d 108, 113 (3d Cir. 2003). That the procedural protection at issue here may have been granted by municipal policy or practice does not change the result. "'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty." *Loudermill*, 470 U.S. at 541.

### D.

Mosca argues that he was denied Equal Protection by the City, Langford and Fitzgerald, because there was no investigation into the allegations against him, while in other instances where City employees were accused of harassment, investigations were performed and the employees were given opportunities to rebut the charges against them. To the extent that Mosca's Equal Protection claim is based on his allegation that he was denied due process, this claim must fail for the same reasons his procedural due process claims failed.

Mosca's Complaint alleges that he was denied the procedural protections given to African-American employees facing charges of

harassment.  Even if the Court assumes that an Equal Protection
violation exists where the City chooses whether or not to
investigate harassment charges on the basis of the race of the
accused, Mosca has not presented sufficient evidence to raise a
material issue of fact as to whether the City has discriminated
in this manner. As noted earlier in Part III.C., the only two
employees alleged to have received a City investigation were both
white.

Whether the comment allegedly made by Mosca to Cole over the
telephone outside the work place is the type of harassment which
would be a proper subject of a City investigation is highly
doubtful.  Mosca made his comment in a social setting.  Cole, the
recipient, certainly never complained that she was being harassed
by Mosca, nor is there anything in the record to suggest that
anyone complained that Mosca was engaged in harassing conduct in
the workplace.  Mosca is alleged to have insulted the Mayor; this
hardly translates into charge of workplace discrimination
requiring some kind of fact-finding investigation.

### E.

Mosca alleges that the City, Langford and Fitzgerald
conspired to deprive him of his federally-protected rights in
violation of 42 U.S.C. § 1985(3).  A plaintiff alleging a
conspiracy in violation of Section 1985(3) must establish:

> (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).

"In order to prevent the use of § 1985(3) as a general federal tort law, courts have been careful to limit causes of action thereunder to conspiracies that deprive persons of constitutionally protected rights, privileges and immunities 'that are protected against private, as well as official encroachment.'" *Brown v. Phillip Morris, Inc.*, 250 F.3d 789, 805 (3d Cir. 2001)(quoting *Libertad v. Welch*, 53 F.3d 428, 446-50 (1st Cir. 1995)).  As discussed above, Mosca has not demonstrated any racial animus on the part of Defendants, nor has he shown any deprivation of his constitutionally protected rights, privileges and immunities.  Therefore, his claim under Section 1985(3) must fail.

## V.

For the reasons set for above, the Court will grant the Defendants' Motion for Partial Summary Judgment as to Mosca's federal statutory and constitutional claims in counts nine through eighteen.  The Court declines to exercise supplemental jurisdiction over Mosca's state law claims in counts one through

25

ten, nineteen and twenty. Count twenty-one is dismissed to the extent that it seeks injunctive relief based on federal causes of action.  The court hereby remands the case to the Superior Court of New Jersey, Atlantic County.  The Court will enter an appropriate order.


Date: August  25 , 2005

s/ *Joseph E. Irenas*
JOSEPH E. IRENAS
Senior United States District Judge